158 N.J. Super. 223 (1978)
385 A.2d 1235
RUBIN GREENBERG, PLAINTIFF-APPELLANT,
v.
GREAT AMERICAN INSURANCE COMPANY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted January 3, 1978.
Decided March 22, 1978.
*224 Before Judges ALLCORN, MORGAN and HORN.
Messrs. Checki, Politan & Bergman, attorneys for appellant (Messrs. Leonard H. Marks and Joel I. Bergman on the brief).
Mr. John J. O'Donnell, attorney for respondent.
The opinion of the court was delivered by MORGAN, J.A.D.
In this appeal we confront problems raised by the application of the income continuation provision of the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-4(b), to an alleged loss of income suffered by a commissioned salesman as a result of injuries sustained in an automobile accident. The stipulated facts upon which the trial judge ruled were that during specified periods after plaintiff's accident his cash income increased over what it had been before the accident. Accordingly, the trial judge ruled that plaintiff suffered no income loss during those periods and entered judgment for the insurance carrier from which plaintiff appeals. 146 N.J. Super. 69 (Law Div. 1976).
The uncontroverted facts, included in the parties' stipulation which formed the basis for the challenged ruling, disclose *225 that on March 23, 1973 plaintiff sustained injuries in an automobile accident which resulted in various periods of total or partial inability to work at his usual occupation, that of a manufacturer's representative selling toys on a commission basis. He was, at the time, the holder of an automobile liability policy issued by Great American Insurance Company, defendant herein, which provided him coverage, on a first party basis, not only for minimum "income continuation benefits" in accordance with N.J.S.A. 39:6A-4, but also extended benefits under N.J.S.A. 39:6A-10. He was, therefore, afforded coverage for maximum benefits in the amount of $5,200 (N.J.S.A. 39:6A-4) and $36,400 (N.J.S.A. 39:6A-10), respectively, by way of indemnification for lost income sustained from the accident-related physical disability.
The nature of plaintiff's work is such that part can be performed at home, such as telephone communications with accounts and the mailing of catalogs. The "field work" component of his job involves personal visits to prospective purchasers to provide exhibits and establish personal rapport. Furthermore, some income consists of delayed payments of commissions based upon previous sales by way of reorder and so-called "residuals." Hence, even during periods in which plaintiff is totally unable to work, that is, even when he is unable to work on the telephone and by mail, he nevertheless receives some income by way of these commissions derived from earlier work.
The parties stipulated that plaintiff was totally disabled from this accident between March 23, 1973 and September 20, 1973. During that period he received the full amount to which he deemed himself entitled, $400 a week.
He was partially disabled from September 20, 1973 until June 12, 1974 to the extent that he was able to work three days out of the week, or at 60% of capacity. During a portion of that period, from September 21, 1973 to December 14, 1973, he received from defendant 40% of the maximum available, or $160 a week. During the remainder thereof he received nothing.
*226 From June 12, 1974 until January 7, 1975 he was again disabled by reason of surgery required by his injuries received in the accident. Between June 6, 1974 and September 20, 1974, a portion of the foregoing period, he was paid at the maximum, $400 a week, and nothing for the remainder of that period of total disability. Hence, for a portion of the period in which the parties admit plaintiff was totally disabled from working, he was paid nothing by way of income continuation benefits.
On January 8, 1975 plaintiff resumed his occupation "on the same 60% basis as theretofore, and that partial disability is expected to continue for a prolonged period of time." He has, however, been receiving nothing for lost income since the date of his last payment in September 1974.
On January 13, 1975 defendant advised plaintiff that because plaintiff's income had increased from 1972 through 1974, he was deemed ineligible for further income continuation benefits. Defendant's position was and is that since plaintiff had not demonstrated a diminution of income, the mere fact that he was unable to work, either partially or totally, as a result of his injuries, did not entitle him to any income continuation benefits. Plaintiff, thereupon, instituted the present declaratory judgment suit which he lost, at the trial level, when the trial judge in substance adopted defendant's position.
We must frankly express our regret at the poverty of facts surrounding the issue upon which we are called to rule. Only the barely essential facts were stipulated. Questions arising from those facts not mentioned must, therefore, go unanswered. For example, it would help to know whether plaintiff's estimate that he is now working at 60% of capacity includes field work or whether that estimate is based upon the relationship between the normal amount of home work and field work. The stipulation does not say. It would have been helpful had we known of the extent of plaintiff's gain in income during the 1972-1974 period and from what source or sources his income was derived during that period. *227 As the matter now stands, we can only speculate as to whether that income came from residuals and reorders, or from field work, or work at home or from some other source, unconnected with his work, or some form of earnings on capital.
The issue presented here is a novel one and arises under relatively new legislation. We have stressed before the desirability of a comprehensive factual development as a basis for considering new issues with substantial, and perhaps unforeseen, ramifications. The case should have been tried and should not have been decided under such a sparse factual stipulation. Nonetheless, the issue is here, the trial court opinion has been published, and rather than remand the matter for trial, we will consider the issue in its present form, and leave what other problems may develop from a more searching factual investigation to some other day.
The statutory foundation for plaintiff's claim, N.J.S.A. 39:6A-4(b), reads as follows:
b. Income continuation benefits. The payment of the loss of income of an income producer as a result of bodily injury disability, subject to a maximum weekly payment of $100.00 per week. Such sums shall be payable during the life of the injured person and shall be subject to an amount or limit of $5,200.00 on account of injury to any one person, in any one accident.
"Income" is defined to include "salary, wages, tips, commissions, fees and other earnings derived from work or employment." N.J.S.A. 39:6A-2. Benefits are therefore provided for loss of commissions resulting from a covered event.
The precise issue posed for resolution is whether, under the stipulated facts, plaintiff has, or may have, lost income despite the fact that his cash receipts during his period of disability, partial and total, exceed those he was receiving before the accident. The trial judge answered this question in the negative, finding that plaintiff's increased income while disabled repelled the notion that he had lost income during that period; although disabled in fact, the disability *228 had no effect on income production. We disagree with this conclusion to the extent that it purports to state a principle of substantive law that where cash receipts after a disabling accident equal or exceed those received before the accident, the victim has suffered no income loss within the meaning of N.J.S.A. 39:6A-4(b). Viewed as a question of fact, such a conclusion may or may not be warranted. Viewed as a statement of substantive law, it is in our view incorrect.
The measure of the income loss referred to in N.J.S.A. 39:6A-4(b) is the difference between what one would have earned had injury not occurred and what one did earn. The formula applies to all income producers, wage earners, those on tips, commissions, royalties, contingent fees and any other sort of income. The evidence adduced to support a claim for lost commissions or contingent fees may well, and probably will, differ from that offered in support of a claim for loss of salary and the loss incurred, if any, may be more difficult to prove to the required degree of certainty, but the formula by which the loss is measured remains the same.
Application of this formula to a salaried worker would permit his recovery of a salary increase scheduled to commence one week after a disabling accident; had the accident not occurred, the worker would have earned the increased salary even though the salary was greater than that which he earned before the accident. He should be permitted to establish that fact. A regularly received annual increment should be recoverable even though the employee was not entitled to it before the accident. A salaried worker should be permitted to prove that he was scheduled to commence work on a second part-time job with which the accident interfered. In all of these hypothetical situations, the injured person, a salaried worker, would be permitted to show what he would have earned had he not been injured. The difference between that figure and what he did earn after the accident *229 measures his income loss. He should not, as a matter of law, be limited to what he was earning before the accident.
The same holds true with other more problematic forms of income. One whose income is computed solely on a commission basis should be permitted to show what he would have earned had the disabling accident not occurred. He, too, should not be limited to his pre-accident earnings.
The unique problems encountered in calculating a loss of commission income should not go without comment. Frequently, as in this case, receipt of portions of a commission earned before an accident, commissions on reorders and residuals, are actually received long after the original transaction upon which the commissions are based. Those portions of the commission earned would be received whatever the later degree of disability. It is, therefore, more than conceivable that in the case of commissioned salesmen, income after an accident will remain at a constant level, increase or decrease without such variations in income level revealing the magnitude of a loss, measured by the above formula. Had injury not occurred, the injured person would have received those deferred payments for past work, and also commissions from successful transactions had he not been injured. His loss is not conclusively measured by what he was receiving before the accident, although such level of income is doubtless evidential and even persuasive. Rather, his loss is measured according to the same formula as is the wage earner's loss, that is, the difference between what he earned after the accident and what he would have earned had he not been injured.
It may be that the trial judge was correct in concluding that "as the field work ability on one side of the scale decreases (due to decreased physical mobility), proportionately `at home' work ability increases (due to plaintiff's inability to be on the road)," thus avoiding the income disabling effects of the injury. The difficulty with this conclusion is that it is purely speculative. Nothing in the stipulated *230 facts supports it. Plaintiff's increase of income may have resulted solely from commissions on reorders and residuals which he would have received in any event and not from an increased use of the telephone. If that is so, plaintiff may well be able to prove that had he been able to perform his normal mode of work in the field, his resulting income, compounded of both the residuals, orders from phone work, together with newly earned commissions, would have been greater. If successful in this proof endeavor, plaintiff would be entitled to recover the difference between that greater income and what he actually earned, or received. In any event, he should not, as a matter of law, be restricted to that which he received before the accident.
By adopting the foregoing formula by which actual income loss is to be measured, we are not attempting to compensate for "loss of earning capacity," as our dissenting brother suggests. Income continuation benefits provided under the no fault law do not redress diminished earning capacity, a traditional item of damage in third party tort cases, but rather indemnify for actual earning loss suffered as a result of a covered automobile accident. That the actual earning loss may, in many cases, be the same as the extent of injury to earning capacity during periods up to trial, does not, however, suggest that the two measures of loss are, in fact, identical concepts. The differences between the two concepts are both obvious and subtle. For example, diminished earning capacity is a concept frequently invoked in tort cases when the accident victim is not employed when injured or when he is a minor who has established no standard by which an earning loss can be measured or when the victim's employer has paid him notwithstanding his absence. But see Hunter v. Hartford Acc. and Indem. Co., 155 N.J. Super. 16 (Law Div. 1977).
We stress, in light of the dissenting opinion, that the formula by which earning loss is to be determined measures just that and not diminished earning capacity. The inquiry is, what would the victim have earned had he not been injured. *231 The rest is in the realm of proof, to which ordinary principles of evidence, including the necessity for reasonable certainty, apply. Distinctions between value of time and earning loss, seized upon by the parties as characterizing the difference in their positions, may be of little more than semantic interest. If calculating the value of time lost from an occupation provides some indication of actual monetary loss, then it should be received as at least probative of that loss. Simply because earning loss rather than injury to earning capacity is being measured does not require rejection of all evidence probative of the latter as long as it is also probative of the former. Although tort damage concepts cannot be applied wholesale in determining benefits under the no fault law, they can be used to the extent appropriate since they come to us embellished with years of experience in their application. Woschenko v. C. Schmidt & Sons, 2 N.J. 269, 277-78 (1949); Smith v. Red Top Taxicab Corp., 111 N.J.L. 439 (E. & A. 1933); Alexander v. Cheaster, 110 N.J.L. 95 (E. & A. 1933). Solutions to proof problems encountered in the common law tort context with the self-employed or those earning on a contingent basis, such as the commissioned salesman, should not be rejected if otherwise useful in the no fault context.
There is no question but that in this case plaintiff, an income producer, received nothing from defendant on account of periods in which he was admitted to be totally disabled from performing any of the tasks incident to his employment. None of the income received during or for that period, therefore, could have been the product of any work performed during that same period. Mere common sense suggests that he lost some income resulting from this total inability to pursue his employment. The same holds true for periods of partial incapacity. Failure to try this case has obscured the sources of the income he was receiving and has disabled the trial court and us from determining the extent of the loss.
*232 We, therefore, reverse the judgment and remand the case for trial.
HORN, J.A.D. (dissenting).
In order to attain a common perspective of the facts so that I may dispel any doubt as to how I interpret the law differently from my colleagues, it is necessary to restate a portion of the stipulated facts which are regarded in the majority opinion as somewhat ambiguous. I am particularly referring to the intimation in the opinion that the stipulated facts do not indicate from "what source or sources [plaintiff's] income was derived * * *" and "we can only speculate as to whether that income came from residuals and reorders, or from field work, or work at home or from some other source, unconnected with his work, or some form of earnings on capital."
Unless we have a common understanding of the source of plaintiff's income we are unable to express our respective views intelligently or meaningfully. If there is doubt, the cause should be remanded to effect a record removing the factual uncertainty.
However, I perceive no such doubt. Plaintiff's attorney expressed what the core of the controversy was when he told the trial judge at the hearing that the "sole issue [was] whether the damages, if any here, are to be computed  I'm sorry, whether the income continuation benefits should be computed on a so-called dollar loss method or on a time loss method * * *" (emphasis supplied). This concept of the issue is reiterated in plaintiff's statement of facts in the following excerpt therefrom:
* * * The matter came before the court on October 25, 1976, the Honorable William R. Morrison presiding. It was agreed at that time, for purposes of the declaratory judgment action, the parties and the court would assume, arguendo, that plaintiff suffered lost occupational time as the result of a disability flowing from the automobile accident of March 23, 1973 in order that the court might decide the limited issue of whether, assuming the truth of the allegations contained in the complaint, the plaintiff was entitled to income *233 continuation benefits because of lost occupational time even though there was no actual reduction in his annual earnings.
The allegations of the complaint, which as part of the stipulation were assumed to be true, include the averment that:
8. Although plaintiff thus had an income during his periods of disability he was prevented by the disabilities from increasing his earnings by personal solicitation, although the precise amount of the diminished earnings cannot be accurately calculated.
Consequently, rather than being concerned with the "source" of the income specifically, we are only concerned with the source of the income in the sense that it emanates from plaintiff's activities as a commission salesman, just as it did before the accident. The only difference is that plaintiff presumptively has worked less since the accident but has consistently earned more each year by way of commissions since the accident. We can eliminate entirely from our consideration any income sources such as earnings on capital or other sources unconnected with his work.
Thus, coming back to the legal issue as projected: Is plaintiff entitled under the act to be reimbursed by defendant for income which he claims he might have earned except for his accident-related incapacity (time loss), notwithstanding that he has actually earned more from his employment in the lesser time spent at it since the accident than he had earned from it before the accident?
I would answer the question in the negative. I do not agree, as stated by my respected colleagues, that the inquiry is "what would the victim have earned had he not been injured." This inquiry, I submit, is the common-law inquiry in determining loss of earning capacity, an inquiry which is proper in a common-law action for damages resulting from a defendant's negligence. The instant action is not one for negligence. It is a contractual action under a policy of insurance, albeit the terms of the policy are circumscribed by *234 the terms of the No Fault Law, particularly N.J.S.A. 39:6A-4(b) and 10 (cf. Peraglia v. Jones, 120 N.J. Super. 518 (App. Div. 1972)), and in construing the terms thereof the real criterion of intent is the No Fault Law itself. Motor Club of America Ins. Co. v. Phillips, 66 N.J. 277, 286 (1974).
In the light of the foregoing, my basic disagreement with the majority's conclusion rests upon my belief that it erroneously construes the phrase "loss of income" found in the governing section of the No Fault Law, N.J.S.A. 39:6A-4(b), to mean "loss of earning capacity."
In his opinion the trial judge seems to have concluded that a special fact situation was presented and that plaintiff would not qualify as one having sustained a loss of income because his "bodily injury disability" did not result in a loss of income. Thus he did not go as far as I would go in construing the statute. Moreover, as already noted, I believe, contrary to the judge's expressed view contained in his opinion (146 N.J. Super. 69, 75 n. 1), that this case does present the "issue of an income producer's right to compensation for diminished work capacity." In fact, it is on this very point that the majority and I disagree.
I will concede that the phrase "loss of income," regarded abstractly, may possibly be expanded to mean loss of earning capacity. However, in the light of the full text of the No Fault Law as well as the objectives which the Legislature sought to attain in enacting it, I believe the majority's stated interpretation constitutes a distorted and unintended one, and one which can only frustrate the achievement of all of those objectives.
In effect, my colleagues apply the traditional measure of damages for earning loss applied in tort cases to the income-loss protection of the No Fault Law. The reasons given for the adaptation are illusory and superficial. One reason given is mentioned in the example of a salaried worker who was injured before a salary increase "scheduled to commence *235 one week after a disabling accident." The majority also mentions the "unique" problems encountered in calculating a loss of commission income because of the particular method of payment and particular basis of earning income to which one in the position of plaintiff is subject.
Evidential problems should not alone, if at all, dictate what should be the proper construction of this or any other statute. Once the proper interpretation is settled, the matter of evidence will follow a normal course within the channel of substantive law. Thus, in my view, once it is settled that loss of income is measured from the starting position of what the income was before the disability, evidence may be admitted to show what income has been lost "as a result of bodily injury disability."
One of the "unique problems" in calculating loss of commission income, as in this case, as stated in the majority opinion, is caused by the "receipt of portions of a commission earned before an accident, commissions on reorders and residuals, are actually received long after the original transaction upon which the commissions are based. Those portions of the commissions earned would be received whatever the later degree of disability." Such a problem is one of proof and not one which should change the plain statutory meaning of §§ 4(b) and 10.
Numerous cases have already dealt, albeit tangentially, with some of the other problems about which the majority was concerned. Hunter v. Hartford Acc. and Indem. Co., 155 N.J. Super. 16 (Law Div. 1977), held that an employee who had taken a voluntary leave of absence with the employer's consent and who intended to return to work was an income producer entitled to the benefits of the No Fault Law as the result of an accident sustained by him. Mazza v. Insurance Co. of North America, 149 N.J. Super. 60 (Law Div. 1977), and Richburg v. Selected Risks Ins. Co., 147 N.J. Super. 401 (Law Div. 1977), each held that temporarily *236 laid-off workers enjoyed the "occupational status" of income producers within the meaning of § 2(d)[1].
When the problem, as stated by the majority, of whether a salaried worker may recover "a salary increase scheduled to commence one week after a disabling accident" arises, that will be the time to resolve it. It cannot and should not be resolved by obiter dictum, and certainly should not be the basis for a construction of the statute now, and in a case where the problem is purely hypothetical. It must be kept in mind that we are dealing solely with recovery under the No Fault Law  and not recovery under common-law tort principles. In cases like the instant one, where permanent or serious injury appears to be present, most likely there is no tort liability exemption. Cf. Montag v. Bergen Bluestone Co., 145 N.J. Super. 140 (Law Div. 1976).
There is a distinct difference between loss of income and loss of earning capacity. Loss of earning capacity comprehends or is measured by a loss of potential earnings resulting from the loss of physical or mental functions. Whether a person is employed at the time of the injury is of no moment where he seeks to recover for such loss. Cf. Coll v. Sherry, 29 N.J. 166, 176 (1959); Woschenko v. C. Schmidt & Sons, 2 N.J. 269 (1949), and Smith v. Red Top Taxicab Corp., 111 N.J.L. 439, 443 (E. & A. 1933). Loss of income comprehends only the actual loss of earnings, measured by the amount being earned at the time of the accident, and in order to recover under the No Fault Law the claimed income producer must have been actually employed or must have enjoyed an occupational status. Hunter v. Hartford Acc. and Indem. Co.; Mazza v. Insurance Co. of North America; Richburg v. Selected Risks Ins. Co., all supra.
The objectives sought to be achieved by the enactment of the No Fault Law were stated by the Automobile Insurance *237 Study Commission (Commission) to be (1) to provide reparations for all accident victims, (2) to provide said reparations at a reduced or stabilized price and (3) to provide for the ready availability of insurance coverage and the streamlining of judicial procedures involved in third-party claims. Reparation Reform for New Jersey Motorists  Report to the Governor and the Legislature, at 7 (December 1971) (hereinafter Commission Report). The Commission had considered the provisions of no-fault laws of Massachusetts, Florida, Delaware and Puerto Rico, as well as proposed laws for Pennsylvania and New York. Commission Report at 29 and 139-144.
Thus, part of the Commission's report stated:
* * * The Commission also recommends keying the basic benefits and the corresponding basic rates to the low income earner with a provision that each insured will have available a lost income benefit commensurate with the actual income he wants to protect. Thus, a low income motorist will not be forced to purchase and pay for more protection than he may need. [Emphasis supplied]
It is highly significant that in recommending our No Fault Law the Commission inferentially rejected the thesis of a recovery for loss of earning capacity as one of the personal-injury protection benefits under the Law. The Delaware no-fault statute contained "no limitation on general damages" (Commission Report at 140); the Florida statute permitted recovery for "loss of earning capacity" (Commission Report at 142; emphasis supplied). See also Griffin v. Travelers Indem. Co., 328 So. 2d 207 (Fla. App. 1976). The Massachusetts law permits recovery for "loss of earnings" (Commission Report at 141). See also, Pinnick v. Cleary, 360 Mass. 1, 9, 271 N.E.2d 592, 597, 599, n. 5 (Sup. Jud. Ct. 1971), wherein by way of dictum the court implied that diminished earning capacity was not recoverable under the Massachusetts no-fault law.
As stated in the trial judge's opinion, 146 N.J. Super. at 73:
*238 * * * New York's "no-fault" statute compensates a person for "basic economic loss." This includes:
(b) Loss of earnings from work which the injured would have performed had he not been injured, and reasonable and necessary expenses incurred by such person in obtaining services in lieu of those that he would have performed for income, up to one thousand dollars per month for not more than three years from the date of the accident causing the injury * * *. [N.Y. Insurance Law (McKinney 1966) § 671(1)(b); emphasis supplied]
Turning to our No Fault Law, it will first be observed that § 4(b) was identified by the Legislature as providing "[i]ncome continuation benefits." L. 1972, c. 70, § 4(b). Section 10 textually refers to "[i]ncome continuation in excess of that provided for in section 4 * * *." Id. § 10. The plain meaning of "income continuation" excludes the concept of recovering under this section when the income which was being received at the time of the accident is not diminished. In the face of assumed ambiguity in the meaning of "loss of income," the section heading may be said to lend weight to the interpretation that I advocate, i.e., that the phrase was intended to comprehend a continuation of income and not a loss of capacity to earn greater income. Pancoast v. Director General of Railroads, 95 N.J.L. 428 (E. & A. 1921); Camden & Amboy R. Co. v. Briggs, 22 N.J.L. 623 (E. & A. 1850).
The Law requires employers to supply information as to "lost earnings" of employees since the date of the bodily injury "and for a reasonable period before the injury."[2] § 13. Personal-injury protection benefits shall be paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same, under penalty of payment of interest at 10 percent per annum. § 5.
*239 Speedy disposition of claims as encouraged under § 5 will be impeded under the majority's interpretation. I envision that its view will lead claimants to demand payment for earnings allegedly lost by reason of disability rather than by reason of failure to receive the compensation he or she was receiving at the time of the injury. More litigation would ensue from the insurer's refusal to respond to such nebulous demands.
In Zyck v. Hartford Ins. Group, 143 N.J. Super. 580 (Law Div. 1976), mod. on an unrelated issue and aff'd in principle, 150 N.J. Super. 431 (App. Div. 1977), the court had before it the question of what loss of income was sustained by plaintiff, who was employed as a salaried salesman and also as a partner in a real estate business wherein his personal endeavors accounted for a portion of the income derived therefrom. Although the instant issue was not totally reached,[3] the court's conclusion in that case appears to coincide with mine. The trial judge stated, as to the determination of plaintiff's earnings at the time of the accident:
* * * The determination of the earnings of a self-employed individual is a difficult task, Bach v. Giordano, 144 Conn. 183, 128 A.2d 323 (Sup. Ct. Err. 1956); however, tort damage concepts cannot be applied with equal force under the No Fault Act. At common law there is a distinction between loss of earnings occurring before trial, Ellis v. Robinson, 7 N.J. Misc. 470, 145 A. 870 (Sup. Ct. 1929), and the prospective loss of earning capacity, Coll v. Sherry, 29 N.J. 166 (1959). Although not generally articulated, the loss of earnings before trial is merely a part of the recoverable element of lost time, lost wages being merely evidential of the value of a party's lost time. 22 Am. Jur.2d, Damages, § 89; Smith v. Red Top Taxicab Corp., 111 N.J.L. 439 (E. & A. 1933); Alexander v. Cheaster, 110 N.J.L. 95 (E. & A. 1932). Under the No Fault Act, however, lost earnings are compensable as such. Therefore, although the common law of damages deals with analogous concepts, it is not necessarily determinative regarding recovery under the No Fault Act. [143 N.J. Super. at 592] *240 The Appellate Division (150 N.J. Super. 431) disagreed with the trial court as to what plaintiff's earnings were from the business operated by him and his wife, and accordingly reduced the amount of his recovery.
This opinion suggests to me that if the majority's interpretation of §§ 4(b) and 10 of the No Fault Law is correct, there is really no need to determine what a claimant's income was before his disability, except to provide some evidence as to his earning capability. Appropos of this, in Zyck, supra, the trial court, in equating profits from business with income, also said:
This conclusion is buttressed by the fact that business profits of this nature are reported as personal income under the Internal Revenue Act. The assured is thus provided with an expeditious means of proving his lost income and is also able to determine in advance the amount of income that will be protected by his no fault coverage. The insurer also benefits since it may make an intelligent decision regarding such claims within a short period of time and without the necessity of extensive investigation. This rule is thus in accord with the guiding principle of efficiency implicit in a workable No Fault scheme. * * * [143 N.J. Super. at 594]
I agree that the No Fault Law should be construed liberally. But this does not mean that its interpretation should be expanded beyond the intent of the law. I think it was intended that an injured person coming within its provisions is required to surrender some common-law benefits for receiving some noncommon-law benefits. For the sake of speedy disposition, one of the surrendered benefits is the common-law right against a culpable party to recover for loss of earning capacity.
For the foregoing reasons I would affirm.
NOTES
[1] "Income producer" means a person, who at the time of the accident causing personal injury or death, was in an occupational status, earning or producing income.
[2] Perhaps this quoted portion of § 13 is vague. I would surmise that it was intended to require the reporting of earnings for a reasonable period before the injury in order to average them where the earnings fluctuate.
[3] There was no claim, as here, that the injured party would have earned more than he had been earning before the accident.